# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTA J. SANTOS,<br><br>         Petitioner,<br><br>    v.<br><br>K. HOLLAND, et al.,<br><br>         Respondents. | Case No. 1:12-cv-01651-LJO-EPG-HC<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner Matta J. Santos is a state prisoner, represented by counsel, proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In the petition, Petitioner challenges his gang validation and the resultant indefinite confinement in the security housing unit, which Petitioner contends violated his rights under the First, Eighth, and Fourteenth Amendments. The Court recommends denial of the petition because the state court decision denying habeas relief was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact.

## I.

## BACKGROUND

Petitioner currently is in the custody of the California Department of Corrections and Rehabilitation ("CDCR") pursuant to a 1996 judgment of the San Diego County Superior Court for kidnapping for ransom. (ECF No. 34 at 12; ECF No. 35 at 7).[1] He was sentenced to life with

---

[1] Page numbers refer to the ECF page numbers stamped at the top of the page.

the possibility of parole plus nine years. (<u>Id.</u>). On February 10, 2011, prison officials validated Petitioner as an associate of the Mexican Mafia. (ECF No. 1 at 53). As a result, Petitioner was placed in the security housing unit ("SHU") indefinitely and transferred to the SHU at Pelican Bay. (ECF No. 35 at 7). Petitioner's administrative appeal challenging his validation as an associate of the Mexican Mafia was denied at all levels of review. (ECF No. 1 at 63–69).

On February 29, 2012, Petitioner filed a state petition for writ of habeas corpus in the Kern County Superior Court, which denied the petition on March 20, 2012. (ECF No. 34-1 at 5–69). On April 20, 2012, Petitioner filed a habeas petition in the California Court of Appeal, Fifth Appellate District, which denied the petition without prejudice on June 21, 2012, because it challenged the conduct of correctional officials outside the district. (ECF No. 34-2 at 67–68). Thereafter, on July 5, 2012, Petitioner filed a habeas petition in the Fourth Appellate District, which summarily denied the petition on July 13, 2012. (ECF No. 34-2 at 2–68). On July 26, 2012, Petitioner filed a habeas petition in the California Supreme Court, which summarily denied the petition on August 29, 2012. (<u>Id.</u> at 70–76).

On October 9, 2012, Petitioner filed the instant petition for writ of habeas corpus, challenging his gang validation and the resultant indefinite confinement in the SHU on First, Eighth, and Fourteenth Amendment grounds. (ECF No. 1). On December 7, 2012, the Court dismissed the petition for lack of jurisdiction. (ECF No. 12). On May 28, 2015, the Ninth Circuit issued a judgment reversing dismissal and remanding the case to this Court for further proceedings on the merits of the petition. (ECF No. 21). On January 20, 2016, the Ninth Circuit issued its formal mandate. (ECF No. 28). Respondent has filed an answer and Petitioner has filed a traverse. (ECF Nos. 34, 35). The parties also filed supplemental briefing per the Court's order. (ECF Nos. 39, 40).

On October 5, 2016, the Court received notice that Petitioner was released from the SHU and transferred to the general population of Wasco State Prison. (ECF No. 41 at 2). Petitioner's transfer to general population was made pursuant to the settlement agreement in <u>Ashker v. Governor of California</u>, No. C-09-05796 (N.D. Cal.). (ECF No. 41 at 1). The settlement agreement provides in pertinent part: "If an inmate has not been found guilty of a SHU-eligible

rule violation with a proven [Security Threat Group][2] nexus within the last 24 months, he shall be released from the SHU and transferred to a General Population level IV 180-design facility, or other general population institution consistent with his case factors." (ECF No. 41 at 1–2; ECF No. 41-1 at 9).

## II.

## STATEMENT OF FACTS

On October 9, 2010, Petitioner was placed in administrative segregation at Ironwood State Prison as a victim of battery that occurred that same day. (ECF No. 1 at 38). On October 18, 2010, Petitioner was notified that he was being retained in administrative segregation because the Institutional Gang Investigator ("IGI") determined there was sufficient evidence to submit a prison gang validation package to the Office of Correctional Safety ("OCS") for review and approval. (Id. at 40). On October 23, 2010, Petitioner was notified that he was being retained in administrative segregation for committing battery on an inmate with a weapon on October 9, 2010.[3] (Id. at 42).

On December 30, 2010, Assistant IGI F. Duenas completed the investigation, which revealed sufficient evidence to identify Petitioner as an associate of the Mexican Mafia. That same day, Petitioner received a CDC 128-B form labeled "Gang Validation Evidence Disclosure and Interview Notification." (ECF No. 1 at 46). Therein, IGI Duenas notified Petitioner that an interview regarding the investigation and suspected gang affiliation would be held within twenty-four hours and listed that the following four source documents were considered in Petitioner's identification as an associate of the Mexican Mafia: (1) CDC 128-B form, labeled "*GANG INFORMATION* – Symbols" and dated August 29, 2010, regarding Petitioner's necklace with a "Eternal Warrior Shield" medallion that signifies affiliation with the Mexican Mafia; (2) CDC 128-B form, labeled "(Staff Information)" and dated October 1, 2010, clarifying terms used in a November 5, 2008 confidential memorandum; (3) CDC 128-B form, labeled

---

[2] The term Security Threat Group ("STG") is defined as groups of three or more persons whose members engage in misconduct or unlawful acts. Cal. Code Regs. tit. 15, § 3000.

[3] According to a disclosure from a confidential source, Petitioner slashed an inmate in the neck and chest with a razor blade on October 9, 2010. Thereafter, Petitioner was chased to the area in front of the canteen and assaulted by other inmates. (ECF No. 1 at 44).

"(Association/Direct Link)" and dated October 1, 2010, regarding Petitioner's address book with the contact information for a validated Mexican Mafia prison gang associate; and (4) a confidential memorandum dated November 5, 2008. (ECF No. 1 at 46–49). Petitioner contends that he was provided with the first three source documents, but did not receive the CDC 1030 confidential information disclosure form regarding the November 5, 2008 confidential memorandum that was considered in the investigation.[4] (ECF No. 1 at 22, 51, 71). On December 31, 2010, Petitioner was interviewed and submitted a written response regarding the source items used in the investigation. (ECF No. 1 at 51, 68).

On January 27, 2011, a gang validation package from IGI P. Covello was received by the OCS for review. (ECF No. 1 at 53). Yet on February 4, 2011, Petitioner received another CDC 128-B form labeled "Gang Validation Evidence Disclosure and Interview Notification" that listed one source document—a CDC 128-B form dated October 1, 2010 categorized as "Staff Information." (ECF No. 1 at 55). According to the CDCR's Third Level Appeal Decision, Petitioner "was provided a new CDC Form 128-B, General Chrono, dated October 1, 2010, as a support document of staff information. The Institution Gang Investigator noted the original document did not provide [Petitioner] with enough information."[5] (ECF No. 1 at 68). And according to the CDCR's Third Level Appeal Decision, Petitioner was afforded another interview and Petitioner submitted a written response disputing the new document on February 7, 2011.[6] (Id.).

On February 10, 2011, the OCS validated Petitioner as an associate of the Mexican Mafia based on the gang validation package it received on January 27, 2011. (ECF No. 1 at 53). According to the CDCR's Third Level Appeal Decision, Petitioner's written responses were considered by the OCS prior to validating Petitioner. (Id. at 68). On March 3, 2011, Petitioner received the OCS's validation decision. (Id. at 53, 59). On March 23, 2011, Petitioner filed an

---

[4] According to the CDCR's Third Level Appeal Decision, Petitioner "was provided copies of all information being utilized in the validation process on December 30, 2010." (ECF No. 1 at 68).

[5] The record before this Court does not include this "new CDC Form 128-B, General Chrono, dated October 1, 2010, as a support document of staff information" that was provided to Petitioner on February 4, 2011. Thus, it is unclear what additional information this new document provided that was not included in the original document that was disclosed to Petitioner on December 30, 2010.

[6] The record before the Court does not include Petitioner's February 7, 2011 written response.

administrative appeal. (ECF No. 1 at 59–60). On April 4, 2011, the appeal was rejected at the first level of review because Petitioner failed to include all the documents in the gang validation package received by OCS. (Id. at 63). On May 12, 2011, the appeal was denied at the second level of review on the merits. (Id. at 65–66). On July 18, 2011, the appeal was rejected at the third level of review because Petitioner failed to include the CDC 1030 confidential information disclosure form regarding the November 5, 2008 confidential memorandum that was considered by the OCS in validating Petitioner. (Id. at 67). On July 29, 2011, Petitioner submitted a request for a copy of the CDC 1030 confidential information disclosure form because he had "never received" it, and on August 3, 2011, Petitioner received a copy. (Id. at 71). On November 8, 2011, Petitioner's appeal was denied at the third level of review. (Id. at 68–69).

### III.

### STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); <u>Davis v. Ayala</u>, 135 S. Ct. 2187, 2198 (2015); <u>Harrington v. Richter</u>, 562 U.S. 86, 97–98 (2011); <u>Williams</u>, 529 U.S. at 413. Thus, if a petitioner's claim has been "adjudicated on the merits" in state court, the "AEDPA's highly deferential standards" apply. <u>Ayala</u>, 135 S. Ct. at 2198. However, if the state court did not reach the merits of the claim, the claim is reviewed *de novo*. <u>Cone v. Bell</u>, 556 U.S. 449, 472 (2009).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." <u>Williams</u>, 529 U.S. at 412. In addition, the Supreme Court decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA and the Court must defer to the state court's decision. <u>Moses v. Payne</u>, 555 F.3d 742, 754 (9th Cir. 2008) (alterations in original) (quoting <u>Wright v. Van Patten</u>, 552 U.S. 120, 125, 123 (2008)).

If the Court determines there is clearly established Federal law governing the issue, the Court then must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 413. A state court decision involves "an unreasonable application of[] clearly established Federal law" if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." <u>Richter</u>, 562 U.S. at 102. That is, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Id.</u> at 103.

///

1    If the Court determines that the state court decision was "contrary to, or involved an
2    unreasonable application of, clearly established Federal law," and the error is not structural,
3    habeas relief is nonetheless unavailable unless it is established that the error "had substantial and
4    injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)
5    (internal quotation mark omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776
6    (1946)).

7    The AEDPA requires considerable deference to the state courts. The Court looks to the
8    last reasoned state court decision as the basis for the state court judgment. See Brumfield v. Cain,
9    135 S. Ct. 2269, 2276 (2015); Johnson v. Williams, 133 S. Ct. 1088, 1094 n.1 (2013); Ylst v.
10   Nunnemaker, 501 U.S. 797, 806 (1991). "When a federal claim has been presented to a state
11   court and the state court has denied relief, it may be presumed that the state court adjudicated the
12   claim on the merits in the absence of any indication or state-law procedural principles to the
13   contrary." Richter, 562 U.S. at 99. Where the state court reaches a decision on the merits but
14   provides no reasoning to support its conclusion, a federal habeas court independently reviews the
15   record to determine whether habeas corpus relief is available under § 2254(d). Walker v. Martel,
16   709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the record is not *de novo* review of
17   the constitutional issue, but rather, the only method by which we can determine whether a silent
18   state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th
19   Cir. 2003). The Court must review the state court record and "must determine what arguments or
20   theories . . . could have supported, the state court's decision; and then it must ask whether it is
21   possible fairminded jurists could disagree that those arguments or theories are inconsistent with
22   the holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102.

23                                                    **IV.**

24                                            **DISCUSSION**

25          **A.  Mootness**

26          In the petition, Petitioner challenges his gang validation and the resultant indefinite
27   confinement in the SHU, which Petitioner contends violated his rights under the First, Eighth,
28   and Fourteenth Amendments. Subsequently, Petitioner was released from the SHU and

1   transferred to the general population at Wasco State Prison. (ECF No. 41 at 2). Respondent

2   contends that because Petitioner now is housed in the general population, Petitioner's claim that

3   Respondent violated his constitutional rights by placing him in the SHU for an indeterminate

4   term is moot. (Id.). Petitioner argues that although his level of confinement has decreased

5   slightly, this Court still can provide effective relief by expunging his gang validation "and

6   thereby remedying the collateral consequences [Petitioner] continues to suffer as a result of that

7   validation, including being subjected to an unlawful level of confinement." (ECF No. 42 at 5).

8        The jurisdiction of federal courts is limited to "actual, ongoing cases or controversies."

9   Lewis v. Continental Bank Corp., 494 U.S. 472, 477 (1990). "This case-or-controversy

10  requirement subsists through all stages of federal judicial proceedings," which "means that,

11  throughout the litigation, the plaintiff 'must have suffered, or be threatened with, an actual injury

12  traceable to the defendant and likely to be redressed by a favorable judicial decision.'" Spencer

13  v. Kemna, 523 U.S. 1, 7 (1998) (quoting Lewis, 494 U.S. at 477). In Spencer, a habeas petitioner

14  challenged the termination of his parole status, for which he had been reincarcerated and

15  subsequently released. Because the petitioner's reincarceration was over, "[s]ubsistence of the

16  suit require[d] . . . continuing 'collateral consequences' of the parole revocation . . . ." Spencer,

17  523 U.S. at 8. Similarly here, as the indeterminate SHU term Petitioner incurred as a result of his

18  gang validation is now over, subsistence of the suit requires continuing "collateral

19  consequences" of the gang validation.

20       In Munoz v. Rowland, 104 F.3d 1096 (9th Cir. 1997), on which Respondent relies in

21  arguing that the petition is moot, a habeas petitioner challenged his gang validation and

22  indefinite assignment to the SHU. The petitioner was later released on parole, and the Ninth

23  Circuit found "[t]he fact that a nondisciplinary finding about Munoz's gang affiliations may

24  influence a purely administrative classification decision, should he someday return to prison, is

25  far too 'ephemeral to constitute a collateral consequence for mootness purposes.'" Id. at 1098

26  (quoting Robbins v. Christianson, 904 F.2d 492, 496 (9th Cir. 1990), abrogated on other

27  grounds, Spencer, 523 U.S. 1). In contrast, here, Petitioner is still incarcerated and his gang

28  validation can subject Petitioner to a more restrictive custody placement. See Cal. Code Regs. tit.

15, § 3375.2(b)(11) ("Documentation establish[ing] that the inmate's inactive [Security Threat Group] status may require special attention or placement consideration" may be used by prison officials "to override the placement of an inmate at a facility according to his/her placement score."); Cal. Code Regs. tit. 15, § 3377.2(b)(5) ("A validated inmate currently housed in a security housing unit and who has their custody reduced from Maximum (MAX) due to reclassification as Inactive, Monitored, or Inactive-Monitored shall serve one year at Close B custody, unless other case factors require a more restrictive designation of Close A. Under no circumstances shall a validated affiliate be released/housed in a minimum security facility or Level I placement.").

Based on the foregoing, the Court finds that <u>Munoz</u> is distinguishable and that imposition of a more restrictive custody placement based on Petitioner's gang validation is "not too ephemeral to constitute a collateral consequence for mootness purposes." <u>Robbins</u>, 904 F.2d at 496. Therefore, the Court will address the merits of the petition.

**B. Due Process**

Petitioner asserts that he has a protected liberty interest in avoiding confinement in the SHU and that his due process rights were violated by (1) insufficient notice, (2) not having a meaningful opportunity to be heard, and (3) the evidence used to validate him did not meet the "some evidence" evidentiary standard. (ECF No. 35 at 20–32). The Due Process Clause of the Fourteenth Amendment provides that no state shall deprive any person of life, liberty, or property, without due process of law. U.S. Const. amend. XIV, § 1. The Supreme Court has held that "the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." <u>Wilkinson v. Austin</u>, 545 U.S. 209, 221 (2005) (citing <u>Meachum v. Fano</u>, 427 U.S. 215, 225 (1976)). However, a liberty interest "may arise from an expectation or interest created by state law or policies." <u>Id.</u> (citing <u>Wolff v. McDonnell</u>, 418 U.S. 539, 556–58 (1974)). In the answer, "Respondent admits that Santos's placement in the SHU gives rise to a federally protected liberty interest[.]"[7] (ECF No. 34 at 4 ¶ 13).

---

[7] However, Respondent denies that Petitioner's claim concerning his gang validation, taken alone, gives rise to a federally protected liberty interest. (ECF No. 34 at 3 ¶ 10).

1    1.   Clearly Established Federal Law

2    "[T]he requirements of due process are 'flexible and cal[l] for such procedural

3 protections as the particular situation demands.'" Wilkinson, 545 U.S. at 224 (second alternation

4 in original) (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). Therefore, rather than

5 adopting bright-line rules, the Supreme Court has applied the following framework to evaluate

6 the sufficiency of particular procedures:

> First, the private interest that will be affected by the official action;
> second, the risk of an erroneous deprivation of such interest
> through the procedures used, and the probable value, if any, of
> additional or substitute procedural safeguards; and finally, the
> Government's interest, including the function involved and the
> fiscal and administrative burdens that the additional or substitute
> procedural requirement would entail.

11 Wilkinson, 545 U.S. at 224–25 (quoting Mathews v. Eldridge, 424 U.S. 319, 335 (1976)).

12    In Wilkinson, the Supreme Court ruled on the constitutionality of the process to classify

13 prisoners for placement at the Ohio State Penitentiary ("OSP"), a "Supermax" facility designed

14 to segregate the most dangerous prisoners from the general prison population. 545 U.S. at 213.

15 The Supreme Court noted that the procedure "provides that an inmate must receive notice of the

16 factual basis leading to consideration for OSP placement and a fair opportunity for rebuttal. Our

17 procedural due process cases have consistently observed that these are among the most important

18 procedural mechanisms for purposes of avoiding erroneous deprivations." Id. at 225–26. The

19 Supreme Court distinguished between classifying and indefinitely segregating dangerous

20 prisoners from the general prison population and "attempting to remove an inmate from free

21 society for a specific parole violation . . . or to revoke good-time credits for specific, serious

22 misbehavior." Id. at 228. For classifying and segregating prisoners, "[w]here the inquiry draws

23 more on the experience of prison administrators, and where the State's interest implicates the

24 safety of other inmates and prison personnel, the informal, nonadversary procedures set forth in

25 Greenholtz [v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1 (1979)], and

26 Hewitt v. Helms, [459 U.S. 460 (1983)], provide the appropriate model." Wilkinson, 545 U.S. at

27 228–29. The Supreme Court concluded that Ohio "provides informal, nonadversary procedures

28 comparable to those we upheld in Greenholtz and Hewitt, and no further procedural

modifications are necessary in order to satisfy due process under the <u>Mathews</u> test." <u>Wilkinson</u>, 545 U.S. at 230.

<u>Greenholtz</u> concerned the level of process due for inmates being considered for release on parole. The Supreme Court concluded that the challenged "procedure affords an opportunity to be heard, and when parole is denied it informs the inmate in what respects he falls short of qualifying for parole; this affords the process that is due under these circumstances. The Constitution does not require more." <u>Greenholtz</u>, 442 U.S. at 16. <u>Hewitt</u> concerned the level of process due for inmates being considered for transfer into administrative segregation pending disciplinary proceedings. The Supreme Court stated that the prison officials "were obligated to engage only in an informal, nonadversary review of the information supporting [the inmate's] administrative confinement, including whatever statement [the inmate] wished to submit, within a reasonable time after confining him to administrative segregation." <u>Hewitt</u>, 459 U.S. at 472. Specifically, the Supreme Court held:

> An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.

<u>Hewitt</u>, 459 U.S. at 476.

2. <u>Notice</u>

Petitioner asserts that he was not afforded sufficient notice of the allegations against him because he was not provided a copy of the CDC 1030 confidential information disclosure form regarding the November 5, 2008 confidential memorandum that was considered in the investigation. (ECF No. 40 at 12). Respondent argues the record indicates Petitioner did receive the CDC 1030, and even if he did not, Respondent contends Petitioner received all the process he was due under clearly established federal law. (ECF No. 39 at 4–5).

///

11

This claim was raised in all of Petitioner's state habeas petitions. (ECF No. 34-1 at 10–11; ECF No. 34-2 at 8–9, 71). The Kern County Superior Court denied relief in a reasoned decision without explicitly addressing this issue. (ECF NO. 34-1 at 5–6). The California Court of Appeal and the California Supreme Court summarily denied relief. (ECF No. 34-2 at 2, 70). Generally, federal courts "look through" summary denials and review the last reasoned state court opinion. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806. Here, however, there was no reasoned opinion on the federal due process claim with respect to sufficiency of notice, and the Court presumes that the claim was adjudicated on the merits. See Williams, 133 S. Ct. at 1096 ("When a state court rejects a federal clam without expressly addressing that claim, a federal habeas court must presume the claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted."). Accordingly, the Court must review the state court record and "must determine what arguments or theories . . . could have supported, the state court's decision; and then [the Court] must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102.

As set forth above, the Supreme Court held that the "informal, nonadversary procedures" set forth in Greenholtz and Hewitt "provide the appropriate model" for determining whether procedures classifying and indefinitely segregating dangerous prisoners from the general prison population satisfy process. Wilkinson, 545 U.S. at 228–29. In Hewitt, the Supreme Court stated that "[a]n inmate must merely receive *some* notice of the charges against him." 459 U.S. at 476 (emphasis added). There is conflicting evidence in the state court record regarding whether Petitioner received a copy of the CDC 1030 confidential information disclosure form before he was validated as a gang associate. (ECF No. 34-2 at 43, 46). Even assuming that Petitioner did not receive a copy of the CDC 1030, it would not have been objectively unreasonable for the state court to determine that Petitioner received some notice of the charges against him. He received copies of the CDC 128-B forms regarding his necklace and address book. (ECF No. 1 at 22, 48–49). Additionally, he received a CDC 128-B form that clarified terms that were used in the November 5, 2008 confidential memorandum. It defined the terms "Bloquero" and "Shot

Caller" in addition to describing the leadership structure and activities of the Mexican Mafia. (Id. at 22, 47). Although Petitioner was not aware of the specific allegations in the confidential memorandum, the information in the CDC 128-B form provided some notice that Petitioner had been accused of association with the Mexican Mafia leadership on or around November 5, 2008.

Based on the foregoing, the Court finds that the state court's denial of Petitioner's due process claim on the basis of insufficient notice was not contrary to, or an unreasonable application of, clearly established federal law. See White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (An unreasonable application of clearly established federal law "must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice.") (quoting Lockyer v. Andrade, 538 U.S. 63, 75–76 (2003)). The state court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

3.  Opportunity to Present Defense to Decisionmaker

Petitioner also asserts that he was not afforded a meaningful opportunity to present his defense to the critical decisionmaker, IGI Covello. (ECF No. 35 at 24). Respondent contends that because this claim was not raised in the instant petition or in the state courts, it should be denied. Respondent also argues that even if the claim was properly raised, there is no basis to find that the state court's denial was an unreasonable application of clearly established federal law. (ECF No. 39 at 6). To the extent that this claim was properly raised,[8] and because the state court did

---

[8] Even if this claim was first raised in the traverse, the Court afforded Respondent an opportunity to respond to the traverse. Respondent has briefed the issue, and thus suffers no prejudice from any failure to properly raise the claim in the petition. See Singh v. Ashcroft, 361 F.3d 1152, 1157 n.3 (9th Cir. 2004). With respect to whether the claim was properly raised in the state court, fair presentation requires "reference to a specific federal constitutional guarantee, as well as a statement of facts that entitle the petitioner to relief." Duncan v. Henry, 513 U.S. 364, 365 (1995). Petitioner's state habeas petition filed in the California Court of Appeal, which was also reviewed by the California Supreme Court, refers to due process rights and the Fourteenth Amendment and cites to Wilkinson v. Austin, 545 U.S. 209 (2005). (ECF No. 34-2 at 5, 12). See Baldwin v. Reese, 541 U.S. 27, 32 (2004) ("A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"). Given that "pro se [habeas] petitions are held to a more lenient standard than counseled petitions," Petitioner's state habeas petition "provided the state court with sufficient facts to apply the constitutional principle upon which [Petitioner] relies." Davis v. Silva, 511 F.3d 1005, 1009 (9th Cir. 2008) (first alteration in original). That is, due process affords Petitioner "an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." Hewitt, 459 U.S. at 476. Regardless of whether this claim was properly raised and exhausted, Petitioner is not entitled to habeas relief on this ground, as discussed infra.

not provide any reasoning in rejecting this claim, the Court must review the state court record and "must determine what arguments or theories . . . could have supported, the state court's decision; and then [the Court] must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." <u>Richter</u>, 562 U.S. at 102.

In <u>Hewitt</u>, the Supreme Court held that the inmate must receive "an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective." 459 U.S. at 476. In the instant case, Petitioner was interviewed twice and submitted two written responses regarding the source items used in the investigation. (ECF No. 1 at 51, 68). The OCS reviewed the written responses before making its decision regarding validation. (<u>Id.</u> at 68).

As the Supreme Court has not addressed who the pertinent decisionmaker is in the context of classifying and indefinitely segregating inmates from the general prison population,[9] the state court's denial of this claim was not contrary to, or an unreasonable application of, clearly established federal law. <u>See</u> <u>Woods v. Donald</u>, 135 S. Ct. 1372, 1377 (2015) (noting that if no Supreme Court case "confront[s] 'the specific question presented by this case,' the state court's decision could not be 'contrary to' any holding from" the Supreme Court) (quoting <u>Lopez v. Smith</u>, 135 S. Ct. 1, 4 (2014)); <u>Woodall</u>, 134 S. Ct. at 1702 (finding that an unreasonable application of clearly established federal law "must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice") (quoting <u>Andrade</u>, 538 U.S. at 75–76). The state court's decision was not "so lacking in justification that there was an error well understood and

---

[9] Outside the habeas context, the Ninth Circuit has found that "the critical decisionmaker responsible for the administrative segregation decision . . . ordinarily is the IGI." <u>Avina v. Medellin</u>, 339 F. App'x 739, 741 (9th Cir. 2009) (citing <u>Toussaint v. McCarthy</u>, 926 F.2d 800, 803 (9th Cir. 1990)). Notably, the district court cases to which Petitioner cites in support of this claim were § 1983 civil rights cases not governed by the AEDPA. Moreover, in <u>Lira</u>, the district court found that the prisoner was deprived of due process because he was not afforded an opportunity to meet with the *assistant* IGI. <u>Lira v. Cate</u>, No. C 00-0905 SI, 2009 U.S. Dist. LEXIS 91292, at *12, 89 (N.D. Cal. Sept. 30, 2009). And in <u>Castro</u>, the district court noted that its finding that the critical decisionmaker was the IGI rather than the assistant IGI "is not crucial because plaintiff never had a meaningful opportunity before either Investigator Ayala or IGI Gonzales to present his views and defend himself." <u>Castro v. Terhune</u>, No. C 98-4877 WHA, 2010 WL 234910, at *11 (N.D. Cal. Jan. 14, 2010).

comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562

U.S. at 103.

4. "Some Evidence"

Petitioner asserts that prison officials validated him as a gang associate and placed him in

the SHU based on "false, unreliable, and insufficient information," in violation of his right to due

process. (ECF No. 1 at 21). Respondent argues that there is no clearly established federal law

requiring a quantum of evidence to support a prison gang validation or an inmate's placement in

the SHU. (ECF No. 39 at 7).

This claim was raised in all of Petitioner's state habeas petitions. (ECF No. 34-1 at 9;

ECF No. 34-2 at 5, 71). The Kern County Superior Court denied this claim in a reasoned

decision. (ECF No. 34-1 at 5). The California Court of Appeals and the California Supreme

Court summarily denied the petitions. (ECF No. 34-2 at 2, 70). The Court presumes that the

California Court of Appeals and the California Supreme Court adjudicated the claim on the

merits. <u>See</u> <u>Richter</u>, 562 U.S. at 99. Generally, federal courts "look through" summary denials

and review the last reasoned state court opinion. <u>See</u> Brumfield, 135 S. Ct. at 2276; <u>Ylst</u>, 501

U.S. at 806. Accordingly, the Court will review the decision of the Kern County Superior Court.

In denying habeas relief, the Kern County Superior Court stated:

> The court has read and considered the petition for writ of habeas corpus filed
> February 29, 2012 from California Correctional Institute, Tehachapi California.
> The petitioner does not disclose his conviction or sentence.
>
> He protests his gang validation of December 30, 2010 as an associate of the
> Mexican Mafia. Petitioner contends that the allegations are false and there is no
> evidentiary support to sustain the gang validation. He asserts his continual
> confinement in segregated housing is cruel and unusual punishment. He demands
> expungement of all gang allegations from his central file and release to the
> general population. The gang validation occurred while an inmate at Ironwood
> State Prison, Blythe California. The Department of Corrections and Rehabilitation
> disagrees.
>
> It cites at least four sources to sustain the validation. On October 9, 2010,
> petitioner was placed in administrative segregation. Petitioner had used a razor to
> inflict injuries on another Mexican national cutting him about the face and chest.
> Petitioner chased his quarry into a crowd of other Mexican nationals who beat
> petitioner for battering their friend. A confidential memo dated November 15,
> 2008 listed petitioner as a "Bloquero". The memorandum stated that petitioner is
> an influential member running activities in the housing complex. A supplemental
> memorandum dated October 1, 2010 defined "Bloquero" and shotcaller. The

"Bloquero" is second in command to the shotcaller who authorizes the "Bloquero['] to conduct gang transactions such as narcotics sales within the prison block. The "Bloquero" can order assaults and other gang disciplinary measures to ensure compliance with the blessing of the shot caller.

The third source is an address book uncovered on October 1, 2010. In that address book is the address of Inmate Valdivia who is a Mexican Mafia member going by the moniker "Morelia". Petitioner goes by the monikers of ["]Clever", ["]Corto", or "Pattas". The final source is a necklace with the Aztec war shield found during a cell search on August 29, 2010. The Aztec war shield is used by the Mexican Mafia to symbolize loyalty among its members and associates.

The court notes that only three independent sources are necessary to sustain a gang validation. 15 Cal. Code Regs. Section 3378(c)(3–4). Here, there are four sources. Symbols, staff information address books, and confidential informants are usable sources to sustain the validation. 15 Cal. Code Regs. Sections 3378(c)(8)(B), 3378(c)(8)(G), 3378(c)(8)(E) and 3378(c)(8)(H). The confidential informants are reliable because part of the information was proven true and obtained through independent investigation. 15 Cal. Code Regs. Sections 3321(c)(1), 3321(c)(4). Even were one to discount the necklace confiscated during the August 29, 2010 [*sic*] as relatively innocuous, there are sufficient sources to sustain the gang validation.

The court finds that the sources are reliable and constitute evidentiary support to sustain the validation. *Cato v. Rushen (1987) 824 F.3d 703, 705 (9th Cir.)*. Petitioner does not sufficiently refute the evidence arrayed against him. The court finds that there is some evidence to support the confinement in segregated housing based upon the gang validation. *In re Lucero (1992) 4 Cal.App.4th 572, 575*. Confinement in segregated housing is necessary to ensure security for inmates and staff alike. *In re Sampson (2011) 197 Cal.App.4th 1234, 1238, Wilkinson v. Austen (2005) 545 U.S. 209, 223–224*.

The Department of Corrections and Rehabilitation authorize such confinement through its own regulations. 15 Cal. Code Regs. Section 3341.5(c)(2)(A)(2). Courts will not second guess the prison administration and application of regulations especially if supported by some evidence. *In re Scott (2013) 113 Cal.App.4th 38, 44, 45*. Petitioner cannot demonstrate that the regulations governing gang validations have no basis in fact or run counter to their intent to curtail gang activities. The court thus finds the regulations valid. *Calderon v. Anderson (1996) 45 Cal.App.4th 607, 612, In re Dikes (2004) 121 Cal.App.4th 825, 833*. Petitioner can control his own destiny by either becoming an inactive associate of the Mexican Mafia, or by debriefing. 15 Cal. Code Regs. Section 3378(e), 15 Cal. Code Regs. Section 3378.1. If petitioner chooses to renounce his gang affiliation, he can have classification reviews at least every eighteen months or earlier if he so desires. 15 Cal. Code Regs. Section 3341.5(c)(2)(A)(1).

On the basis of the foregoing, the petition for writ of habeas corpus is accordingly denied.

(ECF No. 34-1 at 5–6).

The Supreme Court has not addressed the evidentiary standard required for prison gang validation or SHU placement. In <u>Superintendent v. Hill</u>, the Supreme Court held that "the

requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits." 472 U.S. 445, 455 (1984). "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion . . . ." Id. at 455–56. Further, the "Federal Constitution does not require evidence that logically precludes any conclusion but the one reached." Id. at 457. Hill's "some evidence" standard has been described as "minimally stringent." Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994).

To the extent Hill applies,[10] the state court's decision was not contrary to, or an unreasonable application of, Hill. Here, a confidential informant identified Petitioner as a "Bloquero" for the Mexican Mafia. Prison officials discovered among Petitioner's personal belongings an address book with the contact information of a validated Mexican Mafia associate in addition to an Eternal Warrior Shield medallion, which the Mexican Mafia has adopted as a symbol of loyalty. "[T]he record is not so devoid of evidence that the findings of the [prison officials] were without support or otherwise arbitrary." Hill, 472 U.S. at 457.

Based on the foregoing, the Court finds that the state court's denial of Petitioner's due process claim on the basis of insufficient evidence was not contrary to, or an unreasonable application of, clearly established federal law. The state court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

### C. First Amendment

Petitioner asserts that his right to freedom of religion under the First Amendment was violated by the CDCR using Petitioner's necklace with the Eternal Warrior Shield, which Petitioner alleges is related to Aztec, Mayan, and Incan culture and religion, as evidence of affiliation with the Mexican Mafia. (ECF No. 1 at 20, 24). Respondent contends that the prison officials' reliance on the source item is legitimate and neutral, Petitioner has not shown that he

---

[10] Outside the habeas context, the Ninth Circuit has held that due process guarantees an inmate that the evidence used for gang validation meet the "some evidence" evidentiary standard. Castro v. Terhune, 712 F.3d 1304, 1314 (9th Cir. 2013) (citing Bruce v. Ylst, 351 F.3d 1283, 1287 (9th Cir. 2003)).

1  was denied all means of religious expression, accommodating Petitioner would negatively

2  impact prison security, and Petitioner has not set forth an obvious, easy alternative at *de minimis*

3  cost to the prison. (ECF No. 34 at 3–4).

4      This claim was raised in Petitioner's state habeas petition in the California Court of

5  Appeal and the petition for review in the California Supreme Court. (ECF No. 34-2 at 5, 10–11,

6  71). Both of the petitions were summarily denied. (Id. at 2, 70). Because the state court did not

7  provide any reasoning in rejecting this claim, the Court must review the state court record and

8  "must determine what arguments or theories . . . could have supported, the state court's decision;

9  and then [the Court] must ask whether it is possible fairminded jurists could disagree that those

10  arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

11  Court." Richter, 562 U.S. at 102.

12      The First Amendment guarantees the right to free exercise of religion and is applicable to

13  the states through the Fourteenth Amendment. Hartmann v. Cal. Dep't of Corr. & Rehab., 707

14  F.3d 1114, 1122 (9th Cir. 2013). Prisoners cannot be entirely deprived of their constitutional

15  rights, but their rights may be diminished by the needs and objectives of the institutional

16  environment. See Wolff v. McDonnell, 418 U.S. 539, 555–56 (1974) ("Lawful imprisonment

17  necessarily makes unavailable many rights and privileges of the ordinary citizen . . . . But though

18  his rights may be diminished by the needs and exigencies of the institutional environment, a

19  prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime.

20  There is no iron curtain drawn between the Constitution and the prisons of this country.")

21  (citations omitted).

22      As a threshold matter with respect to a free exercise claim, Petitioner "must show that the

23  government action in question substantially burdens [Petitioner's] practice of [his] religion."

24  Jones v. Williams, 791 F.3d 1023, 1031 (9th Cir. 2015) (citing Graham v. C.I.R., 822 F.2d 844,

25  851 (9th Cir. 1987), aff'd sub nom. Hernandez v. C.I.R., 490 U.S. 680, 699 (1989)). "A

26  substantial burden . . . place[s] more than an inconvenience on religious exercise; it must have a

27  tendency to coerce individuals into acting contrary to their religious beliefs or exert substantial

28  pressure on an adherent to modify his behavior and to violate his beliefs." Jones, 791 F.3d at

1  1031–32 (quoting <u>Ohno v. Yasuma</u>, 723 F.3d 984, 1011 (9th Cir. 2013)). <u>Turner v. Safley</u>, 482

2  U.S. 78 (1987), provides the test for evaluating prisoners' First Amendment challenges. <u>Shaw v.</u>

3  <u>Murphy</u>, 532 U.S. 223, 230 (2001). In <u>Turner</u>, the Supreme Court held that "[w]hen a prison

4  regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably

5  related to legitimate penological interests." 482 U.S. at 89. <u>See</u> <u>Ward v. Walsh</u>, 1 F.3d 873, 876–

6  77 (9th Cir. 1993) (holding <u>Turner</u> still applies to free exercise claims of prisoners after

7  <u>Employment Division, Dep't of Human Resources v. Smith</u>, 494 U.S. 872 (1990)). The four

8  factors relevant to this inquiry are: (1) whether there is a "valid, rational connection between the

9  prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether

10 there are alternative means of exercising the right that remain open to prison inmates"; (3) "the

11 impact accommodation of the asserted constitutional right will have on guards and other inmates,

12 and on the allocation of prison resources generally"; and (4) "the absence of ready alternatives"

13 to the challenged action. <u>Turner</u>, 482 U.S. at 89–90.

14     Here, Petitioner does not meet the threshold requirement of establishing that the CDCR's

15 use of Petitioner's Eternal Warrior Shield necklace as evidence of affiliation with the Mexican

16 Mafia substantially burdened the practice of his religion. Even assuming a substantial burden, it

17 was not unreasonable for the state court to deny Petitioner's First Amendment claim under

18 <u>Turner</u>. It is clear that the CDCR has a legitimate interest in prison security and stopping prison

19 gang activity, <u>Bruce v. Ylst</u>, 351 F.3d 1283, 1289 (9th Cir. 2003), and it is not irrational to

20 identify prison gang associates based on their use of gang symbols that also may have religious

21 significance. Moreover, Petitioner does not demonstrate that he has no alternative means of

22 practicing his religion or that there is "an alternative that fully accommodates [Petitioner's]

23 rights at *de minimis* cost to valid penological interests." <u>Turner</u>, 482 U.S. at 91.

24     Based on the foregoing, the Court finds that the state court's denial of Petitioner's First

25 Amendment claim was not contrary to, or an unreasonable application of, clearly established

26 federal law. The state court's decision was not "so lacking in justification that there was an error

27 well understood and comprehended in existing law beyond any possibility for fairminded

28 disagreement." <u>Richter</u>, 562 U.S. at 103.

### D.  Eighth Amendment

Petitioner asserts that his placement in the SHU violates the Eighth Amendment's prohibition of cruel and unusual punishment. (ECF No. 1 at 26). Citing to <u>Anderson v. County of Kern</u>, 45 F.3d 1301, 1316 (9th Cir. 1995), Respondent denies that placement in the SHU violates the Eighth Amendment. (ECF No. 34 at 4). This claim was raised in Petitioner's state habeas petition in the California Court of Appeal and the petition for review in the California Supreme Court. (ECF No. 34-2 at 5, 13, 71). Both of the petitions were summarily denied. (<u>Id.</u> at 2, 70). Because the state court did not provide any reasoning in rejecting this claim, the Court must review the state court record and "must determine what arguments or theories . . . could have supported, the state court's decision; and then [the Court] must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." <u>Richter</u>, 562 U.S. at 102.

The Supreme Court has stated:

> The Eighth Amendment's ban on inflicting cruel and unusual punishments, made applicable to the States by the Fourteenth Amendment, "proscribe[s] more than physically barbarous punishments." It prohibits penalties that are grossly disproportionate to the offense, as well as those that transgress today's "'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'" Confinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards.

<u>Hutto v. Finney</u>, 437 U.S. 678, 685 (1978) (citations omitted). To the extent Petitioner asserts that an indefinite SHU term was disproportionate to his conduct, Petitioner is not entitled to habeas relief. <u>See Ruiz v. Cate</u>, 436 F. App'x 760, 761 (9th Cir. 2011) (finding proper the district court's dismissal of the petitioner's Eighth Amendment claim that his indefinite SHU term was disproportionate to his prison gang validation because "administrative segregation . . . is within the terms of confinement ordinarily contemplated by a sentence.") (quoting <u>Anderson</u>, 45 F.3d at 1316).

To prevail on a claim for a violation of the Eighth Amendment based on prison conditions, Petitioner "must objectively show that he was deprived of something sufficiently serious and make a subjective showing that the deprivation occurred with deliberate indifference

1    to the inmate's health or safety." Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010)

2    (quotation marks and citations omitted). The Supreme Court has stated that "[o]nly where prison

3    conditions deny an inmate 'the minimal civilized measure of life's necessities,' . . . could they be

4    considered cruel and unusual punishment." Hudson v. McMillian, 503 U.S. 1, 20 (1992) (quoting

5    Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). According to Supreme Court precedent,

6    placement in the SHU, without more, does not necessarily violate the Eighth Amendment. See

7    Hutto, 437 U.S. at 685–86 ("[P]unitive isolation 'is not necessarily unconstitutional, but it may

8    be, depending on the duration of the confinement and the conditions thereof.' It is perfectly

9    obvious that every decision to remove a particular inmate from the general prison population for

10   an indeterminate period could not be characterized as cruel and unusual.") (citation omitted).

11   Moreover, current Ninth Circuit case law holds that indeterminate isolation does not constitute

12   cruel and unusual punishment.  Toussaint v. Yockey, 722 F.2d 1490, 1494 n.6 (9th Cir. 1984)

13   ("Even an indeterminate sentence to punitive isolation does not without more constitute cruel

14   and unusual punishment.").

15        That said, the Court recognizes there is an increasing awareness in both the legal

16   community and the public at large of the issues concomitant with prolonged solitary

17   confinement.[11] This increasing awareness is illustrated by the Ashker settlement, in which the

18   CDCR implemented a "Step-Down Program" that provides gang-validated inmates the

19   opportunity to incrementally transfer from the SHU to general population in response to

20   allegations that indefinite confinement in the SHU violated the Eighth Amendment.  Justice

21   Kennedy also expressed concern about prolonged solitary confinement in a recent concurrence.

22   See Davis v. Ayala, 135 S. Ct. 2187, 2208–10 (2015) (Kennedy, J., concurring) ("Years on end

23   of near-total isolation exact a terrible price. In a case that presented the issue, the judiciary may

24   be required, within its proper jurisdiction and authority, to determine whether workable

25   alternative systems for long-term confinement exist, and, if so, whether a correctional system

---

26   [11] See, e.g., The Arthur Liman Public Interest Program, Yale Law School & Association of State Correctional
     Administrators, Time-In-Cell: The ASCA-Liman 2014 National Survey of Administrative Segregation in Prison
27   (2015), https://www.law.yale.edu/system/files/area/center/liman/document/asca-liman_administrativesegregation
     report.pdf; G.A. Res. 70/175, United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson
28   Mandela Rules) (Dec. 17, 2015), http://www.un.org/en/ga/search/view_doc.asp?symbol=A/RES/70/175.

should be required to adopt them.") (citation omitted).

However, in light of Supreme Court precedent, and being mindful of the AEDPA's highly deferential standard of review, the Court finds that the state court's denial of Petitioner's Eighth Amendment claim was not contrary to, or an unreasonable application of, clearly established federal law. The state court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103.

## V.

## RECOMMENDATION

Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned United States District Court Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 839 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **January 10, 2017**             /s/ _Erica P. Grosjean_
                                          UNITED STATES MAGISTRATE JUDGE